TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-09-00238-CV






Denise Hicks, Appellant


v.


Falcon Wood Property Owners Association, Appellee






FROM THE DISTRICT COURT OF HAYS COUNTY, 274TH JUDICIAL DISTRICT

NO. 07-1965, HONORABLE WILLIAM HENRY, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N


 This appeal arises from disputes between a residential property owners association
and one of its members concerning the association's interpretation and enforcement of
restrictive covenants. The disputes escalated into litigation, and the association--appellee Falcon
Wood Property Owners Association (FWPOA)--ultimately obtained a judgment against the
individual property owner--appellant Denise Hicks--awarding it $150,800 in statutory damages,
plus attorney's fees and permanent injunctive relief. Hicks appeals. In three issues, Hicks
argues that the jury findings on which the judgment was based were immaterial or not supported by
legally sufficient evidence. We agree with Hicks and will reverse the district court's judgment and
render judgment that FWPOA take nothing on its claims.




BACKGROUND

 Falcon Wood is a residential subdivision with large, multi-acre lots that is located
in Hays County, roughly halfway between San Marcos and Wimberley. Lots in Falcon Wood
are burdened by restrictive covenants (the Restrictions) that have been recorded in the Hays County
real property records. The Restrictions limit the types of structures that are permitted on each
property principally to one "dwelling unit . . . to be used for residential purposes." This "dwelling"
is required to have at least 1600 square feet of living area (excluding porches), consist of
"new construction materials," have a concrete or pier and beam foundation, be served with water and
electricity, and be "equipped with septic tank or other sewage disposal system meeting all applicable
laws, rules, standards and specifications." Manufactured homes are not considered "dwellings," and
the use of "a structure of a temporary character" as a residence is also prohibited in Falcon Wood.
On the other hand, Falcon Wood property owners are permitted to have on their property, in addition
to the authorized "dwelling," certain types of outbuildings, including guest houses, detached garages,
and "work shops." Also, reflecting a semi-rural atmosphere, barns are allowed, and residents are
even permitted to have one horse, cow, or goat ("as long as the animals do not become a nuisance
or threat"), plus additional farm animals (excluding pigs or hogs) if being raised by the property
owner for "4-H school sponsored programs." 

 The Restrictions are administered and enforced by appellee FWPOA, a non-profit
corporation comprised of the subdivision's property owners. FWPOA acts through a board of
directors that, the evidence suggests, is quite vigorous in discharging its responsibilities as
it perceives them. The Restrictions also require prior approval by an "Architectural Control
Committee" of the FWPOA before any of the permissible types of dwellings, outbuildings, or
barns can be "erected, altered, or placed on property" in Falcon Wood. Following such approval,
the Restrictions require that "[a]ny building, structure or improvement commenced on any tract shall
be completed as to exterior finish and appearance within six (6) months from the commencement
date." Until construction is completed, the Restrictions also limit property owners' rights to keep
or occupy campers, recreational vehicles (RVs), or tents on their land. In relevant part, the
Restrictions state:



 "Prior to construction of a dwelling, an occupied, self-contained camper or recreation vehicle
may be kept on the property no longer than 14 consecutive days out of a 30 day period."

 "During the construction of a dwelling, a camper or recreation vehicle may be kept on the
property for up to six (6) months, so long as said camper or recreation vehicle is hooked up
to an approved septic system." The six-month period corresponds to the six-month deadline
for completing construction of the dwelling. 

 "Occupied, non self-contained campers and tent camping will also be permitted on the
property for no longer than seven (7) consecutive days out of a 30 day period. All non self-contained campers and tent campers must provide some type of chemical toilet for their
campsite." 

 "Prior to construction of a dwelling, un-occupied campers, recreation vehicles and tents must
be removed from the property when not in use." (1) 




 Appellant Hicks purchased two adjacent Falcon Wood lots during the fall of 2006.
There is no dispute that she received a copy of the Restrictions at that time. (2) Hicks made plans
to construct a two-story log house on her property. In 2007, it is undisputed that Hicks submitted
her plans and specifications for her new house to the Architectural Control Committee, as the
Restrictions required. The plans were approved.

 In the meantime, Hicks ended up closing on the sale of her existing residence in
San Marcos before construction was to begin on her new house in Falcon Wood. Searching for a
"solution" for the interim period in which she would lack a permanent residence, Hicks inquired
with the FWPOA leadership as to whether she could live on her property in an RV and comply with
the Restrictions' prohibition against keeping "an occupied, self-contained camper or recreation
vehicle . . . on the property . . . longer than 14 consecutive days out of a 30 day period" by moving
her RV back and forth between each of her two adjacent lots every 14 days. She was informed that
she could not do so, based on the FWPOA board's "interpretation" of the Restrictions. Over the
ensuing months, the board, for whatever reason, reminded Hicks several times, in writing or orally,
that the Restrictions restricted her rights to live on her property in an RV. 

 On June 27, 2007, Hicks filed paperwork that began the process for her to obtain
a permit for her house's septic system from the Hays County Environmental Health Department. 
On July 25, Hicks's plans for her house's septic system were approved by the county and Hicks
obtained a permit for its installation. Construction of Hicks's house began on August 18, 2007. This
event, the parties agree, triggered the Restrictions' six-month requirement for Hicks to complete
construction "as to exterior finish and appearance" and made the deadline February 18, 2008. Hicks
testified that she served as her own general contractor and thus was on the property "a lot" during
construction, typically arriving in the early mornings, around the same time as the workers.

 Excavation for the house's septic system began in August, shortly after work on
the foundation began, with the expectation that work would be completed in September. During the
following Labor Day weekend, on or about the evening of August 31, Hicks moved an RV (initially
driving, but ultimately having to tow it) from San Marcos to her Falcon Wood property. The RV had
an on-board toilet, a sink, and a shower, running water, and a storage tank to contain wastewater
generated by the toilet, sink, and shower. There is no dispute that this RV was "self-contained" as
that term is used in the Restrictions.

 The installation of the septic system for Hicks's house encountered a major setback
when excavators hit a cave. It was later determined by a geologist that the area around Hicks's
home contained numerous caves. Matters were further complicated by the fact that Falcon Wood
is located over the environmentally sensitive Edwards Aquifer. Amid these challenges, Hicks
ultimately had to obtain a new design and location for her septic system. There was also evidence
that disputes between Hicks and her contractors may have contributed to delays in getting her
septic system installed.

 Around September 24, two members of the FWPOA board of directors came onto
Hicks's property (traveling what witnesses indicated was approximately the length of a city block
from the public right-of-way to Hicks's home site) to "inspect" the site. (3) They informed Hicks
that she could not live on the property in her RV because the Restrictions required the RV to
be connected to the house's septic system (which, of course, had not been constructed yet). Hicks
informed her visitors about the problems she had encountered with the septic system installation.
Also, according to one of the board members who testified, Hicks expressed the view that she was
in compliance with the Restrictions because she had a porta-potty. Hicks later testified at trial that
she never used the toilet in her RV during construction, opting instead for a porta-potty that was
located on the site, and tried to minimize generation of wastewater by rarely taking showers in the
RV and eating take-out meals rather than cooking and doing dishes. She added that the company
that periodically serviced the porta-potty also serviced her RV (i.e., emptying or cleaning out the
wastewater storage tank). Hicks--a single mom to a six year-old--also presented evidence that she
slept overnight in the RV only on "some nights" during construction and instead frequently spent
nights in motels or with friends. 

 Subsequently, during a meeting in mid-October, the FWPOA board voted to grant
Hicks a two-week "variance" allowing her to keep her RV on her property without it being connected
to her house's septic system. The "variance" was to expire after November 3. By this time, the
evidence reflected, the relationship between the FWPOA board and Hicks had become strained,
stemming in part from personality conflicts. (4)

 Hicks, with her young daughter, appeared at a November 1 board meeting, expressed
exasperation at her continuing problems with her septic system, and explained that she would be
unable to complete installation of her septic system before November 3. The board refused to grant
Hicks any additional "variances" or extensions. At some point during the meeting, tempers flared
and Hicks, according to FWPOA witnesses, indicated that she could or would not move her RV off
her property and invited the board to sue her. On the following day, two FWPOA board members
returned to Hicks's property to "inspect" the septic system problems Hicks had mentioned the
preceding evening. Hicks called 911, threatened to have the board members arrested for trespassing,
and escorted them off her property.

 On November 13, 2007, FWPOA filed suit against Hicks, alleging that "[s]ince
November 4, 2007 [the date after the 'variance' expired], Denise Hicks has been in violation of the
applicable deed restrictions related to living on the properties without an approved septic system and
by residing in a recreational vehicle on the properties." FWPOA sought temporary and permanent
injunctive relief barring Hicks from "residing in a recreational vehicle located on the property" and
"residing on the property in any way until an approved septic system is installed on the property,"
statutory damages of $200 per day for each day of violations, (5) and attorney's fees. Following a
hearing, on December 12, the district court granted a temporary injunction compelling Hicks to
"remove her recreational vehicle and cease to reside on [her two lots] until such time as there is a
working, county approved septic system in place on the property." Hicks filed a mandamus petition
that prompted this Court to stay the temporary injunction and request a response. (6) While Hicks's
mandamus petition was pending, the district court amended the temporary injunction twice. We
ultimately denied mandamus relief on March 27, 2008.

 In the meantime, Hicks had obtained another permit to install her septic system on
December 19, 2007. During the following weeks, the system was installed, inspected, and approved
by Hays County. Although there was evidence that the system had been approved as early as
February 7, 2008, it wasn't until March 17 that Hays County issued its formal written approval.

 On or shortly after February 18, 2008--the expiration of the six-month completion-of-construction deadline--two FWPOA board members, this time with Hicks's approval, entered
Hicks's property to "inspect" the construction. There is no dispute that the exterior structure of the
house was complete by this time--the walls were up, the roof was on, and windows and doors had
been installed. Both board members complained, however, that the house's garage, which was
part of the first floor structure, had exposed cinder-block walls. In their assessment, the walls
appeared "unfinished." (7) There was evidence that during this conversation, Hicks indicated that she
would be applying stucco to the garage walls, but that the weather had been too cold for proper
application. However, Hicks did not apply stucco to the garage walls thereafter. In May, one of
the board members wrote Hicks and advised her that she still had "not completed the exterior of
your home as you agreed" and that Hicks was, therefore, in violation of the Restrictions' six-month
deadline to complete construction. The letter also accused Hicks of violating a Restriction
prohibition against "junk motor vehicles"--namely, Hicks's RV--explaining that "[a]n old
inoperable motor home of that vintage is in our opinion a junk motor home and must be removed
from your property."

 The case went to trial beginning January 6, 2009. (8) In the interim, it is undisputed
that Hicks had not removed her RV from her property, nor had she applied stucco to her garage walls
as the FWPOA board had demanded. Following the presentation of evidence, the district court
submitted, over objections, whether Hicks violated the Restrictions in any of five different ways:



 "by, prior to the construction of a dwelling, keeping an occupied, self-contained camper or
recreational[ (9)] vehicle on the property longer than 14 consecutive days out of a 30 day
period" (Question 1).

 "by keeping a camper or recreation vehicle on the property during construction for more than
6 months, without said camper or recreation vehicle being hooked up to an approved septic
system" (Question 3).

 "by keeping a camper or recreational vehicle on the property without an approved septic
system" (Question 5).

 "by failing to complete a structure or improvement as to exterior finish and appearance
within 6 months from the commencement of construction" (Question 7).

 "by using [her property] as a depository for an abandoned or junked motor vehicle[]"
(Question 9). 




As to any of these issues on which the jury returned an affirmative finding, the jury was to determine
the "period of time" in which Hicks committed the violation, identifying a beginning and
ending date. Finally, predicated on an affirmative finding as to any of the alleged violations, the
district court submitted an issue inquiring as to the amount of FWPOA's reasonable and necessary
attorney's fees.

 The jury found that FWPOA did not meet its burden to prove that Hicks kept "an
unoccupied, self-contained camper or recreational vehicle on the property longer than 14 consecutive
days out of a 30 day period" prior to construction or that she had used her property "as a depository
for an abandoned or junked motor vehicle[]." However, it found that Hicks had committed the other
three violations. As for the periods in which she committed these violations, the jury found that
Hicks had kept "a camper or recreation vehicle on the property during construction for more than
6 months, without said camper or recreation vehicle being hooked up to an approved septic system"
beginning not later than February 19, 2008 (the date after the six-month deadline for completing
construction expired) and ending not earlier than January 8, 2009 (the date of the jury's verdict). The
jury also found that Hicks had failed "to complete a structure or improvement as to exterior finish
and appearance within 6 months from the commencement of construction" during the same period. 
The jury further found that Hicks "ke[pt] a camper or recreation vehicle on the property without
an approved septic system" beginning not later than November 4, 2007 (the date after the "variance"
ended) and ending not earlier than March 17, 2008 (the date of Hays County's formal written
approval of Hicks's septic system).

 Hicks moved the district court to disregard the jury's findings in Questions 3, 5, and
7, the corresponding dates-of-violation findings, and the attorney's fees finding. The district court
instead rendered judgment on the verdict. Based on the jury's findings, it determined that Hicks
had violated the Restrictions for a total of 754 days. This figure corresponds roughly (10) to the sum of
(1) the number of days Hicks was found to have violated the six-month construction deadline (i.e.,
February 19, 2008 to January 8, 2009, or 324 days); plus (2) the number of days in which Hicks was
found to have violated one or both of the Restrictions related to having her RV on the property (i.e.,
November 4, 2007 to January 8, 2009, or 431 days). (11) The district court then multiplied the 754 days
times the maximum $200 per day in statutory damages (12) to yield $150,800, and rendered judgment
awarding that amount to FWPOA. Further, based on the jury's findings that Hicks had failed to
complete construction as of trial, the district court awarded permanent injunctive relief compelling
Hicks, within 90 days of the judgment, "to complete the exterior construction of her dwelling."
Finally, the district court awarded FWPOA $11,287 in attorney's fees found by the jury.

 After a motion for new trial was denied by operation of law, Hicks appealed
the judgment. 


ANALYSIS

 Hicks brings three issues on appeal. In her first issue, she challenges the
district court's judgment awarding relief based on jury findings that she kept an RV on her property
"without an approved septic system" or "without . . . being hooked up to an approved septic system."
In her second issue, Hicks complains of the judgment awarding monetary and injunctive relief for
her "failing to complete" her house "as to exterior finish and appearance." Assuming we sustain
either or both of these issues, Hicks argues in her third issue that we should reverse the award of
attorney's fees to FWPOA.


Standard of review

 Several of Hicks's appellate complaints turn on construction of the Restrictions.
During trial, some of the FWPOA officers who testified expressed the view that the association's
board of directors have discretion to "interpret" the Restrictions as they see fit to "benefit the
community." Whatever value the goal of "benefitting the community" might have when resolving
land-use disputes through neighborly diplomacy, if courts end up getting involved, we must construe
restrictive covenants according to contract-law principles. Pilarcik v. Emmons, 966 S.W.2d 474,
478 (Tex. 1998); Owens v. Ousey, 241 S.W.3d 124, 129 (Tex. App.--Austin 2007, pet. denied). We
construe restrictive covenants as a whole in light of the circumstances at the time they were enacted,
giving effect to every sentence, clause, and word of a covenant, and avoiding constructions that
would render parts of the covenant superfluous or inoperative. Pilarcik, 966 S.W.2d at 478; Owens,
241 S.W.3d at 129. Our primary concern is to ascertain and give effect to the true intention of
the drafters as expressed in the covenants. See Gulf Ins. Co. v. Burns Motors, 22 S.W.3d 417, 424
(Tex. 2000); Owens, 241 S.W.3d at 129. We focus not on the drafters' subjective intent, but on their
objective intent, as it is reflected in the written covenants. See Lopez v. Munoz, Hockema & Reed,
22 S.W.3d 857, 861 (Tex. 2000); Tien Tao Ass'n v. Kingsbridge Park Cmty. Ass'n, 953 S.W.2d
525, 528 (Tex. App.--Houston [1st Dist.] 1997, no pet.); Travis Heights Improvement Ass'n
v. Small, 662 S.W.2d 406, 410 (Tex. App.--Austin 1983, no writ). When terms are defined,
those definitions control our construction of the covenants. See Provident Life & Accident Ins. Co.
v. Knott, 128 S.W.3d 211, 219 (Tex. 2003). If terms are not defined, they "are given their
plain, ordinary, and generally accepted meanings" unless the instrument itself shows them to be
used in a technical or different sense. See Valence Operating Co. v. Dorsett, 164 S.W.3d 656, 662
(Tex. 2005). Construction of restrictive covenants--and whether particular facts constitute a
violation--presents a question of law, which we review de novo. Owens, 241 S.W.3d at 129;
Indian Beach Prop. Owners' Ass'n v. Linden, 222 S.W.3d 682, 705 (Tex. App.--Houston [1st Dist.]
2007, no pet.). 

 If a restrictive covenant has a definite or certain meaning, it is unambiguous as a
matter of law and it should be construed liberally to effectuate the parties' intent. Tex. Prop. Code
Ann. § 202.003 (West 2007); Pilarcik, 966 S.W.2d at 478; Owens, 241 S.W.3d at 129. However,
to say that an unambiguous restrictive covenant is to be "liberally construed" does not mean that it
necessarily restricts the land use in dispute--the covenant, properly construed, may unambiguously
state otherwise. See Owens, 241 S.W.3d at 130 (restrictive covenant provisions authorizing
amendments or extensions could not be "liberally construed" to permit amendments or extensions
after expiration of express 25-year term). Also, if the covenant is ambiguous (i.e., subject to
more than one reasonable interpretation), doubts are to be resolved in favor of the free and
unrestricted use of the property, and any ambiguity must be strictly construed against the
party seeking to enforce it. Wilmoth v. Wilcox, 734 S.W.2d 656, 657 (Tex. 1987). A party seeking
to enforce a restrictive covenant has the burden of proof at trial to show that the restrictions
are valid and enforceable. Gillebaard v. Bayview Acres Ass'n, 263 S.W.3d 342, 347
(Tex. App--Houston [1st Dist.] 2007, pet. denied).

 Hicks also challenges the sufficiency of the evidence supporting some of the jury's
findings underlying the judgment. When a party is challenging the legal sufficiency of the evidence
supporting an adverse finding on an issue on which an opposing party has the burden of proof,
it prevails if the record shows any one of the following: (1) there is no evidence supporting a
vital fact, (2) the evidence offered to prove a vital fact is no more than a mere scintilla, (3) the
evidence conclusively establishes the opposite of the vital fact, or (4) the court is barred by law or
the rules of evidence from considering the only evidence offered to prove the vital fact. See City of
Keller v. Wilson, 168 S.W.3d 802, 810 (Tex. 2005). More than a scintilla of evidence exists when
the evidence supporting the finding, as a whole, "rises to a level that would enable reasonable
and fair-minded people to differ in their conclusions." Merrell Dow Pharms. v. Havner, 953 S.W.2d
706, 711 (Tex. 1997); Transportation Ins. Co. v. Moriel, 879 S.W.2d 10, 25 (Tex. 1994). If the
evidence is so weak as to do no more than create a mere surmise or suspicion of its existence, its
legal effect is that it is no evidence. Haynes & Boone v. Bowser Bouldin, Ltd., 896 S.W.2d 179, 182
(Tex. 1995). Conversely, evidence conclusively establishes a vital fact when the evidence is such
that reasonable people could not disagree in their conclusions. City of Keller, 168 S.W.3d at 814-17. 

 When conducting a legal-sufficiency review, we must view the evidence in the light
most favorable to the trial court's findings, "crediting favorable evidence if reasonable jurors could,
and disregarding contrary evidence unless reasonable jurors could not." City of Keller, 168 S.W.3d
at 807. Moreover, we must indulge every reasonable inference that would support the district court's
findings. Id. at 822. The ultimate test for legal sufficiency is whether the evidence at trial would
enable reasonable and fair-minded people to reach the verdict under review. See id. at 827.

 When a party challenges the factual sufficiency of the evidence supporting an
adverse finding on which the opposing party had the burden of proof, we should set aside the finding
only if the evidence supporting the finding is so weak as to be clearly wrong and manifestly unjust.
See Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). We must consider, weigh, and examine all of
the evidence in the record, both supporting and against the finding, to decide whether the finding
should be set aside. See id.; Plas-Tex, Inc. v. U.S. Steel Corp., 772 S.W.2d 442, 445 (Tex. 1989);
Pool v. Ford Motor Co., 715 S.W.2d 629, 635 (Tex. 1986).


Construction deadline 

 In her second issue, Hicks urges that the jury's finding in Question 7 that she "fail[ed]
to complete a structure or improvement as to exterior finish and appearance within 6 months from
the commencement of construction" and its finding in Question 8 as to the duration of that violation
should have been disregarded. Question 7 tracks the Restrictions' requirement that "[a]ny building,
structure or improvement commenced on any tract shall be completed as to exterior finish and
appearance within six (6) months from the commencement date." Hicks asserts that the evidence
is legally and factually insufficient to support a finding that she committed any conduct constituting
a violation of this requirement, assuming it is properly construed. (13) We agree.

 The Restrictions do not define the phrase "completed as to exterior finish and
appearance" in the six-month deadline provision. However, as Hicks observes, we may obtain
guidance as to its meaning by examining other provisions of the Restrictions. See Pilarcik,
966 S.W.2d at 478; Owens, 241 S.W.3d at 129. As previously noted, the Restrictions require "[a]ll
dwellings, detached garages, work shops, and barns" to be "approved in writing by the Architectural
Control Committee prior to being erected, altered, or placed on property." Article IV of the
Restrictions, which specifically addresses the duties and powers of the Architectural Control
Committee, (14) contains the following corresponding provision:


No building or other improvement of any character shall be erected or placed, or the
erection or placing thereof commenced or changes made in the design or exterior
appearance thereof (excluding without limitation, painting, staining or siding), or any
addition or exterior alteration made thereof after original construct[ion], on any
Tract of the Subdivision until the obtaining of the necessary approval (as hereinafter
provided) from the Committee of the construction plans and specifications for the
construction or alteration of such improvements or demolition or destruction of
existing improvements by voluntary action. Approval shall be granted or withheld
based on matters of compliance with the provisions of this instrument. 



Succeeding provisions of Article IV require that property owners submit copies of the "plans and
specifications for all proposed construction (initial or alteration) to be done . . . including plot plans
showing location on the tract," mandate that the Committee's express approval or disapproval "shall
be in writing," provide for deemed approval of plans and specifications approved if the Committee
fails to act within 30 days, and permit the Committee to grant certain variances. Article IV also
provides that the granting of Committee approval (whether in writing or through deemed approval)
"shall constitute only an expression of opinion by the Committee" that the Restrictions "shall be
complied with if the building and/or other improvements are erected in accordance with said plans
and specifications and plot plan" and that such approval would not constitute waiver or estoppel as
to any Restriction requirements "in the event that such building and/or improvements are not
constructed in accordance with such plans and specifications but . . . fail to comply with the
provisions hereof."

 Two features of the foregoing provisions inform the meaning of "completed as
to exterior finish and appearance." First, Article IV reflects a two-stage process to ensure that
new buildings, other improvements, or "addition[s] or exterior alteration[s] made thereto" located
on Falcon Wood properties comply with the Restrictions: (1) proposed projects must be approved
in advance by the Architectural Control Committee, which scrutinizes the submitted plans and
specifications for the project and grants or withholds approval "based on matters of compliance
with" the Restrictions; (2) the project, as ultimately constructed, must be "in accordance with said
plans and specifications and plot plan" that were submitted to and approved by the Committee.
Considered in the context of these provisions, the phrase "completed as to exterior finish
and appearance" in the six-month deadline provision contemplates completion of the exterior
construction in accordance with the plans and specifications that have been approved by
the Committee.

 The second feature of Article IV that is instructive is its exclusion of "without
limitation, painting, staining, or siding" from the types of "changes made in the design or exterior
appearance" of "buildings or other improvements" during construction that require Architectural
Control Committee approval. Article IV, in other words, permits property owners to change the
"painting, staining, or siding" of "buildings or other improvements" originally called for in their
approved plans and specifications without obtaining Architectural Control Committee approval.

 Informed by the provisions in Article IV, we conclude that "[a]ny building, structure
or improvement commenced on any tract shall be completed as to exterior finish and appearance
within six (6) months from the commencement date" unambiguously required only that Hicks
complete her house's exterior construction in accordance with the plans and specifications
that the Architectural Control Committee had previously approved. Moreover, even assuming
that Hicks's approved plans and specifications had called for a specific type or color of "painting,
staining, or siding," Hicks was permitted to change those features without Committee approval. 
In the alternative, we hold these are reasonable constructions of the Restrictions that would give
rise to an ambiguity, in which case we would construe the ambiguity strictly against the FWPOA
and in favor of Hicks's free and unrestricted rights to use and enjoy her property. See Wilmoth,
734 S.W.2d at 657.

 Applying this construction of the provision, there is no evidence that Hicks failed to
"complete" construction on her home "as to exterior finish and appearance" before the six-month
completion-of-construction deadline of February 19, 2008. There is no contention that Hicks's
construction as of that date had deviated from or was incomplete with respect to the plans and
specifications that had been approved by the Architectural Control Committee. Moreover, the sole
evidence of "unfinished" construction presented by FWPOA is in the nature of "painting, staining,
or siding." In support of its claim, FWPOA presented testimony of its board members complaining
that Hicks had failed to apply stucco to her garage walls. FWPOA also introduced photographs of
Hicks's house. Emphasizing the photographs, FWPOA in essence urged jurors to find that Hicks
had failed to "complete" construction based on their subjective views as to whether her garage walls
appeared "finished" or not. However, it is instead the legal principles of contract that define Hicks's
private property rights vis-à-vis the Restrictions.

 Hicks's approved plans and specifications did not require her to apply stucco to
her garage (and she arguably would have been free to change those plans during construction even
if they had). Nor does any other requirement of the Restrictions require Hicks to apply stucco to
her house. Thus, properly construing the requirement, there is no evidence that Hicks "fail[ed] to
complete a structure or improvement as to exterior finish and appearance within 6 months from
the commencement of construction." Consequently, the jury's findings in Questions 7 and 8 must
be disregarded and cannot be a basis for the district court's judgment awarding damages and
injunctive relief. We sustain Hicks's second issue. 


RV on property "without an approved septic system"

 Within her first issue, Hicks argues that the jury's findings in Questions 5 and 6 are
immaterial because "keeping a camper or recreational vehicle on the property without an approved
septic system" is not a violation of any Restriction as a matter of law. See Southeastern Pipeline Co.
v. Tichacek, 997 S.W.2d 166, 172 (Tex. 1999) (jury question is immaterial "when it should not have
been submitted, it calls for a finding beyond the province of the jury, such as a question of law, or
when it was properly submitted but has been rendered immaterial by other findings"). We again
agree with Hicks.

 Question 5 was based on FWPOA's view that the Restrictions prohibited "keeping
a camper or recreational vehicle on the property" before the "approved septic system" is installed
for the "dwelling." Leaving aside for now whether the term "approved septic system" as used in
the Restrictions is limited to the septic system that is ultimately installed for the "dwelling," the
act of "keeping a camper or recreational vehicle on the property" prior to the approval of the
dwelling's septic system does not violate any Restriction. To the contrary, the Restrictions explicitly
permit "an occupied, self-contained camper or recreation vehicle" to be "kept on the property" up
to 14 days out of a 30-day period even before construction of the dwelling beings. The Restrictions
further allow "[o]ccupied, non self-contained campers and tent camping," with only "some type of
chemical toilet for their campsite," up to 7 consecutive days out of a 30-day period. These express
authorizations would be entirely without effect if the Restrictions could somehow be construed
to prohibit "keeping a camper or recreational vehicle on the property" before the dwelling's
septic system is installed and approved. We must construe the Restrictions to give effect to every
sentence, clause, and word of a covenant and avoid constructions that would render parts of the
covenant superfluous or inoperative. Pilarcik, 966 S.W.2d at 478; Owens, 241 S.W.3d at 129.
Consequently, we must reject the construction of the Restrictions that underlies Question 5.

 The construction advocated by FWPOA finds no textual support in the Restrictions.
FWPOA apparently derived its view that the Restrictions prohibited Hicks from moving her RV
onto her property before her home's septic system was installed from the Restrictions' requirement
that "[a]ll dwellings . . . must be equipped with septic tank or other sewage disposal system
meeting all applicable laws, rules, standards, and specifications" (emphasis added). Construing
the Restrictions as a whole, however, a "dwelling" refers to the "one dwelling unit" that is permitted
on each property--i.e, the structure with at least 1600 square feet of living space, built of
"new construction materials," and having a concrete or pier and beam foundation. "Dwellings"
under the Restrictions are plainly distinguished from "campers" and "recreation vehicles."

 FWPOA has also seemed to rely upon a broad interpretation of the proviso that
"[d]uring the construction of a dwelling, a camper or recreation vehicle may be kept on the property
for up to six (6) months, so long as said camper and recreation vehicle is hooked up to an approved
septic system." However, whether Hicks violated that provision is not the issue that was submitted
in Question 5. Question 5 instead inquired as to whether Hicks had violated the Restrictions by
"keeping a camper or recreational vehicle on the property without an approved septic system." That
conduct, in itself, does not violate the Restrictions.

 Because "keeping a camper or recreational vehicle on the property without
an approved septic system" is not conduct that violates the Restrictions, the jury's finding in
Question 5 that Hicks had engaged in that conduct and its finding in Question 6 that Hicks had done
so from November 4, 2007 through March 18, 2008 are immaterial and cannot be a basis for the
district court's judgment.


RV not "hooked up" to "an approved septic system"

 The foregoing holdings leave only the jury's findings in Questions 3 and 4 as
a possible basis for an award of statutory damages and attorney's fees to FWPOA. (15) Unlike
Question 5, Question 3 tracked a provision that is actually contained in the Restrictions--the proviso
that "[d]uring the construction of a dwelling, a camper or recreation vehicle may be kept on the
property for up to six (6) months, so long as said camper or recreation vehicle is hooked up to an
approved septic system." Question 3 inquired, in a single issue, whether Hicks had violated this
requirement in both of two ways: "[1] keeping a camper or recreation vehicle on the property during
construction for more than 6 months, [2] without said camper or recreation vehicle being hooked up
to an approved septic system." Question 4, in turn, asked the jury to determine the beginning
and ending date of any violation it found in Question 3. The jury, as noted, found that Hicks had
engaged in the conduct beginning on February 19, 2008, the date after the six-month completion-of-construction deadline expired, through January 8, 2009, the date of the jury's verdict.

 For the same reason there is no evidence to support the jury's finding that Hicks
violated the six-month completion-of-construction deadline, there is no evidence to support the
jury's finding within Question 3 that Hicks "ke[pt] a camper or recreation vehicle on the property
during construction for more than 6 months, without said camper or recreation vehicle being hooked
up to an approved septic system," or did so during the period the jury found in Question 4. "During
construction" necessarily refers to the erection of the "building, structure or improvement" that must
be "completed as to exterior finish and appearance within six (6) months from the commencement
date," as further confirmed by the fact that the six-month limitation on keeping the camper or RV
on the property "during construction" corresponds to the six-month completion-of-construction
deadline. Consequently, because there is no evidence that construction of Hicks's house was
not "completed as to exterior finish and appearance within six (6) months from the commencement
date," Hicks could not possibly have kept her RV on the property "during construction for more
than 6 months."

 However, the jury's affirmative finding in Question 3 necessarily rested upon a
subsidiary finding that Hicks "ke[pt] a camper or recreation vehicle on the property . . . without said
camper or recreation vehicle being hooked up to an approved septic system" for however long
construction lasted within the six-month period. There is no dispute that Hicks's RV remained on
her property from August 31, 2007 (and from November 4, 2007, the date the FWPOA's "variance"
ended) through the time of trial. Thus, Hicks undisputedly "kept" her RV on the property throughout
the construction period. As the evidence does not conclusively establish the date prior to
February 18, 2008 on which Hicks's construction was completed, a new trial on that issue would be
required if the evidence supports a finding that Hicks "kept" her RV on the property during this
period "without said [RV] being hooked up to an approved septic system."

 Within her first issue, Hicks argues that there is no evidence she violated the
requirement that her RV be "hooked up to an approved septic system," assuming that requirement
is properly construed. In the alternative, Hicks urges that this requirement applies only to occupied,
self-contained RVs, and that the evidence is legally and factually insufficient to support a finding
that she "occupied" her RV, in the sense of staying there overnight, on anything more than a sporadic
or occasional basis.

 The Restrictions do not explicitly define either "approved septic system" or what it
means for a "camper or recreation vehicle" to be "hooked up" to such a system. Some guidance can
be obtained from the context in which these provisions appear. As previously noted, the Restrictions
impose several limitations on the rights of Falcon Wood property owners to keep or occupy
campers, RVs, or tents on their property before construction of their dwelling is completed. "Prior
to construction of a dwelling," the Restrictions provide, "an occupied, self-contained camper or
recreation vehicle may be kept on the property no longer than 14 consecutive days out of a 30 day
period." Immediately following this provision is the provision at issue--"During the construction
of a dwelling, a camper or recreation vehicle may be kept on the property for up to six (6) months,
so long as said camper or recreation vehicle is hooked up to an approved septic system." Next
are provisions addressed to occupied, non-self-contained campers and tent camping--"Occupied,
non self-contained campers and tent camping will also be permitted on the property for no longer
than seven (7) consecutive days out of a 30 day period. All non self-contained campers and
tent campers must provide some type of chemical toilet for their campsite."--and a requirement
addressed to unoccupied campers, RVs, and tents--"Prior to construction of a dwelling, un-occupied
campers, recreation vehicles and tents must be removed from the property when not in use."

 As Hicks observes, the context implies that the "camper or recreation vehicle" that
"may be kept on the property for up to six (6) months, so long as said camper or recreation vehicle
is hooked up to an approved septic system" is "self-contained"--i.e., has its own wastewater storage
capability--because the next sentence imposes a different limitation on "non self-contained"
campers both prior to and during construction. Also, as Hicks seems to acknowledge, the phrase
"hooked up to an approved septic system" denotes being connected to "an approved septic system"
that is external to the self-contained camper or RV--i.e., one that the camper or RV's on-board
wastewater retention system is emptied or dumped into--and cannot be construed as a reference to
the camper or RV's own wastewater retention system.

 The Restrictions, as noted, require that all "dwellings" placed or constructed in
Falcon Wood "be equipped with septic tank or other sewage-disposal system meeting all applicable
laws, rules, standards and specifications." From this, FWPOA reasons that the "approved
septic system" to which Hicks's RV was required to be "hooked up" meant the same septic system
that she was constructing for her dwelling. While the "septic tank or other sewage disposal system
meeting all applicable laws, rules, standards and specifications" required for a dwelling would seem
to suffice as "an approved septic system" by any reasonable definition, we cannot agree that
the Restrictions reflect an intent to limit "an approved septic system" solely to the dwelling's
"approved septic system." The Restrictions contain no requirement of that sort (e.g., a requirement
that the RV be "hooked up" to "the approved septic system for the dwelling") or even a term of
limitation like "the approved septic system" instead of the open-ended "an approved septic system"
that the drafters used. Nor, as Hicks points out, do the Restrictions specify or require that the RV
must be continuously "hooked up" or connected to "an approved septic system."

 The evident purpose of the requirement that a self-contained RV be "hooked up to
an approved septic system," especially when considered in context with the requirements addressed
to non-self-contained campers and tents, is to ensure that the property owner disposes of
any wastewater from his self-contained camper or RV in a manner that is legally authorized or
approved. There is no evidence that Hicks failed to comply with this requirement. The evidence
was undisputed that the same company that periodically serviced or cleaned out Hicks's porta-potty
likewise serviced Hicks's RV. There was no contention that the company's system of waste removal
was not legally authorized or approved. Consequently, there is no evidence to support any finding
that Hicks "ke[pt] a camper or recreation vehicle on the property during construction . . . without
said camper or recreation vehicle being hooked up to an approved septic system." We sustain
Hicks's first issue.

 

Attorney's fees 

 Because the foregoing holdings mean that FWPOA does not prevail on any of its
claims, we likewise sustain Hicks's third issue, which challenges the judgment's award of attorney's
fees to FWPOA as a prevailing party.



CONCLUSION 

 Having sustained each of Hicks's three issues on appeal, we reverse the
district court's judgment and render judgment that FWPOA take nothing on its claims.


 

 __________________________________________

 Bob Pemberton, Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Reversed and Rendered

Filed: August 19, 2010



1. This portion of the Restrictions also imposes set-back restrictions on the location
of "campers, recreation vehicles, and campsites" and requires that they "be kept in a clean and
tidy manner at all times." These regulations are not at issue in this proceeding. 
2. Hicks likewise acknowledged that a "Falcon Wood" sign at the subdivision's entrance
indicates "Deed Restrictions Enforced."
3. The Restrictions authorize FWPOA to "perform inspections to assist the [Architectural
Control] Committee" and to enter property to enforce the Restrictions "after notice and hearing
(unless a bona fide emergency exists in which event this entry may be exercised without notice
(written or oral) to the Owner in such manner as to avoid any unreasonable or unnecessary
interference with the lawful possession, use or enjoyment situated thereon by the Owner or any other
person)." The evidence does not indicate whether or how the FWPOA board members attempted
to comply with the Restrictions in making this or any other apparently uninvited incursions onto
Hicks's property. 
4. In addition to emphasizing examples of what board members regarded as Hicks's abrasive
behavior and her unwillingness to follow the rules, FWPOA took pains to highlight for the jury
a supposed comment by Hicks in which she indicated that she had once lived in New York. Hicks,
for her part, emphasized what she regarded as the FWPOA board's obstinate, petty, and high-handed
overreaching of its authority under the Restrictions. Whatever the truth regarding these matters
might actually have been, it is apparent that relations among these neighbors were becoming less
than neighborly.
5. See Tex. Prop. Code Ann. § 202.004(c) (West 2007) ("A court may assess civil damages
for the violation of a restrictive covenant in an amount not to exceed $200 for each day of the
violation."). 
6. Cause No. 03-07-00721-CV, In re Denise Hicks. Hicks was pro se at the time. 
7. One of the board members also complained that the walls looked "unfinished" because
Hicks had not applied "color" to the logs. That complaint is not at issue on appeal.
8. By then, Hicks was represented by counsel.
9. The jury charge used both "recreation vehicle" (the term used in the Restrictions) and
"recreational vehicle."
10. The calculations that follow yield a total of 755 days, a one-day discrepancy.
11. Alternatively, because the jury found that Hicks violated both the six-month construction
deadline and the prohibition against keeping her RV "on the property during construction for
more than 6 months, without said camper or recreation vehicle being hooked up to an approved
septic system" during the same 324-day period (February 19, 2008 through January 8, 2009), the
same sum results by adding (1) the number of days Hicks violated either or both the six-month
construction deadline and/or kept her RV "on the property without an approved septic system"
(November 4, 2007 to January 8, 2009, or 431 days) and (2) the number of days Hicks was found
to have kept her RV "on the property during construction for more than 6 months, without said
camper or recreation vehicle being hooked up to an approved septic system" (February 19, 2008 to
January 8, 2009, or 324 days). 
12. See Tex. Prop. Code Ann. § 202.004(c). As Hicks observes, this resulted in a total award
of $400 per day during the period between February 19, 2008 through January 8, 2009. 
13. Hicks also points out that FWPOA never amended its original petition, which complained
only of the RV-related violations, to allege violations of the six-month completion-of-construction
requirement. We need not address the implications of this pleading omission or whether Hicks
preserved her complaint at trial because we conclude Hicks prevails on her no-evidence ground.
14. The land-use restrictions directly at issue are each contained in Article III of the
Restrictions. 
15. The foregoing holdings also eliminate any overlapping daily violations that could
have supported the district court's award of a total of $400 per day in statutory damages between
February 19, 2008 and January 8, 2009. For this reason--and because we ultimately hold that
FWPOA is not entitled to any daily statutory damages from Hicks--we need not reach a contention
by Hicks that the $400 per day total awards exceeded the statutory maximum.